# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Spiniello Companies,                              Civ. No. 11-1218 (JJK)

     Plaintiff/Counter Defendant,

v.

Infrastructure Technologies, Inc.,

     Defendant/Counter Claimant.

**FINDINGS OF FACT,
CONCLUSIONS OF LAW,
AND ORDER FOR JUDGMENT**

Johnathan W. Dettmann, Esq., and Faris Rashid, Esq., Faegre Baker Daniels LLP, counsel for Plaintiff/Counter Defendant.

Rolf E. Sonnesyn, Esq., Carena Crowell-Chambers, Esq., and Aaron M. Simon, Esq., Tomsche, Sonnesyn & Tomsche, P.A., counsel for Defendant/Counter Plaintiff.

This action arises out of a subcontract agreement between Spiniello Companies ("Spiniello") and Infrastructure Technologies, Inc. ("Infratech"). According to Spiniello, Infratech's delay in performing under the subcontract caused Spiniello to suffer damages. Infratech asserts that it timely performed its obligations under the subcontract and claims that Spiniello owes it the amount agreed upon for performance, plus interest. Spiniello filed suit against Infratech for breach of contract, breach of the covenant of good faith and fair dealing, and tortious interference with prospective economic gain. Infratech filed a breach of contract counterclaim for compensatory damages and costs. The Court held a bench trial on May 24, 2012, and May 25, 2012. The parties agree that the only

claims that remain for disposition are Spiniello's claim for damages for breach of contract, and Infratech's claims for breach of contract damages and for interest under Minn. Stat. § 471.425.  Based on the entire record and proceedings, the testimony at trial and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law.  All of the Findings of Fact set forth herein are undisputed or have been proven by a preponderance of the evidence. To the extent that the Court's Conclusions of Law include what may be considered Findings of Fact, they are incorporated herein by reference.

## FINDINGS OF FACT

### A.      THE PARTIES AND THE CLEANING/LINING PROCESS

1.      Spiniello is a New Jersey corporation in the business of sewer and water line rehabilitation.

2.      Infratech is a Minnesota corporation that specializes, in part, in the cleaning of sewer pipelines owned by municipalities.

3.      Spiniello's crews travel around the country to perform work.  When a crew is on site, Spiniello incurs costs to lodge crewmembers in hotels, and it also provides crewmembers with a daily living allowance.

4.      One method Spiniello uses to rehabilitate sewer lines is the Cured-in-Place-Piping ("CIPP") technique.  This technique involves lining the length of a sewer pipe with a felt-like liner, which in turn is coated with resin.  The resin is then cured with heated water, causing it to harden.  This hardened liner essentially creates a "new" pipe inside of the pre-existing, older sewer pipe.

5.     Before Spiniello's crews can line a sewer pipe, the pipe must be cleaned. Over time, silt and debris often build up at the bottom of a sewer pipe. This debris is sometimes created when the concrete frame of a sewer pipe deteriorates and falls into the bottom of the pipe. For the CIPP process to be most effective and create a mold that maximizes the diameter of the pipe available, all debris must be removed from the pipe before lining. Spiniello typically hires local contractors to perform the cleaning work necessary for CIPP lining.

6.     To facilitate cleaning and the CIPP lining process, Spiniello uses a "bypass" pump to divert the flow of water around the segment of pipe it is rehabilitating. Segments of pipe are identified by reference to manhole numbers, which are assigned to manholes by the City. Diverting the flow of water allows the cleaning crew and Spiniello's crew to enter the pipe through the manholes with their equipment, and the bypass allows the cleaning crew to efficiently spray water through a jetter to move debris. Without the bypass, the cleaning crew cannot efficiently move the debris due to the heavy flow of water in the pipe. If the jetting is done underwater, the debris will often just circle back around the nozzle and settle back down to the floor of the pipe, which prevents it from being pulled back toward the manhole to facilitate removal.

7.     Infratech utilizes cleaning/vactor trucks to spray water through a jet nozzle to pull back debris in the pipe to a particular manhole site and to vacuum out debris with an attached vacuum tube. These trucks have a tank to collect the

debris that is deposited from the vacuum tube and a tank to hold water to utilize with the jetter.

8.    Once a pipe is cleaned, the cleaning crew sends a camera through the pipe, a process known as "televising," to ensure that it has been properly cleaned.

**B.    WITNESSES**

9.    Gerhardt Rodenberger was the division manager of the CIPP Division at Spiniello in 2009, and at that time he had been with Spiniello for three and a half years.

10.    Arbraham Naqeeb was a project manager with Spiniello in 2009.  He oversaw and handled the administrative aspect of the CIPP-lining project for the City of St. Cloud in 2009.

11.    Jack Bowling worked for Spiniello for twelve and a half years and was a superintendent in 2009 when he was working on the project for the City of St. Cloud in 2009.  His role at that time was to stay in contact with the City of St. Cloud about scheduling (including scheduling with subcontractors), coordination of the project, and ordering supplies and materials.[1]

12.    Richard Quast is Infratech's President and was one of the founders of the company.  In 2009, his duties included dispatching crews, helping estimate projects, invoicing, and hiring and firing.

---

[1]    Excerpts of Bowling's trial deposition transcript were read into the record at trial.  He did not testify in person.

13.     Todd Sykora was Infratech's head of operations in 2009, and at that time he had been with Infratech for twelve years.  His job included, but was not limited to, keeping track of cleaning crews; getting things lined up for upcoming jobs for the cleaning crews; making sure that the crews had water permits and disposal permits; helping the crews set up; and solving problems.

14.     Greg Ranta has worked for Infratech for eighteen years.  He is Infratech's estimator/administrator, and his duties include looking at projects, figuring out pricing, and delivering bids.

15.     Lonnie Jones has worked at Infratech as a pipe cleaner since 2006, and he worked on site on the St. Cloud project in 2009.

16.     Lon MacRae is a former employee of Infratech.  He worked for Infratech in 2009 on the St. Cloud project, and at that time he had worked for Infratech for two years.  During the time he was employed at Infratech, he was a pipe cleaner, a shop mechanic, and an operations manager.

**C.     THE BIDDING PROCESS**

17.     In September 2009, the City of St. Cloud, Minnesota ("the City") awarded a pipeline rehabilitation contract to Spiniello (the "Prime" or "General" Contract). (Trial Ex. 2.)  The project called for the rehabilitation of approximately 6,000 feet of sewer pipeline belonging to the City, which ranged in diameter from 54 inches to 72 inches.  The CIPP liner work was to be completed by December 31, 2009.

18.     During the bidding process for the General Contract, Spiniello procured subcontractor bids for certain aspects of the work required by the General

Contract, including pipeline cleaning.

19.    In response to Spiniello's request for subcontractor bids, Infratech

submitted estimates to Spiniello for cleaning, televising, and manhole

rehabilitation work.  (Trial Ex. 6 at INFRATECH 00428.)  When Infratech

submitted its estimates to Spiniello, it knew that the cleaning job would be difficult

and increased its pricing accordingly.

20.    Spiniello received the General Contract from the City, and Spiniello

accepted Infratech's cleaning and televising bids.

21.    Spiniello and Infratech executed a subcontractor agreement (the

"Subcontract"), wherein Infratech agreed to clean approximately 6,000 feet of

sewer pipeline for a contract price of $81,336.74.

**D.    THE SEPTEMBER 25, 2009 SCHEDULE**

22.    The General Contract required Spiniello to submit an overall project bar

graph to the City.  Specifically, the General Contract stated:

> Bar graphs shall show the beginning and completion of all major
> components of the work for review by the Engineer prior to the pre-
> construction conference.  Bar graphs will be broken out for each
> bypass set-up and will have the following major components outlined
> in a detailed schedule/bar graph:  temporary/advance notice traffic
> signing, mobilization, erosion/sediment control, dewatering, traffic
> control, bypass pumping, cleaning, televising, sanitary sewer
> manhole rehabilitation, sanitary sewer CIPP, open trench work,
> manhole removal, and street and turf grading/restoration.
>
> . . . . Weekly progress meetings shall be held at City Hall.  The bar
> graph chart(s) will be updated by the Contractor to reflect actual
> work progress and be submitted to the Engineer at the weekly
> progress meetings.

(Trial Ex. 5 at Spiniello 000458–59.)

23.     The City sent a notice to Spiniello on September 9, 2009, setting a Preconstruction Conference for September 29, 2009.  In that notice, the City asked Spiniello to either submit a Bar Chart Schedule to the City prior to the Preconstruction Conference, or to bring it to that meeting.  The City also asked Spiniello to notify and request Spiniello's subcontractors to attend the Preconstruction Conference.  (Trial Ex. 9 at INFRATECH 00003.)

24.     The September 9, 2009 Preconstruction Conference Notice did not state that Spiniello should provide its subcontractors with the Bar Chart Schedule.

25.     Abraham Naqeeb, Spiniello's project manager, drafted the Bar Chart Schedule required by the City on September 25, 2009.

26.     The Schedule indicates that the bypass was supposed to be set up and operational by October 26, 2009, and that cleaning was to occur for ten business days starting on October 26, 2009.  The lining of the pipeline was scheduled to occur in segments, starting on November 2, 2009, and Spiniello was scheduled to have a Spiniello crew on site for lining from November 2, 2009, through December 11, 2009.  In addition, the Schedule indicates that Spiniello would have Spiniello crew on site through demobilization, which was scheduled to occur December 21–24, 2009.  (Trial Ex. 8.)

## E.     THE PRECONSTRUCTION CONFERENCE

27.     The City held a Preconstruction Conference on September 29, 2009.

28.     Those who attended the Preconstruction Conference on September 29,

7

2009, included Bob Jopp, the engineer with the City of St. Cloud, Abraham

Naqeeb and Jack Bowling from Spiniello, Greg Ranta from Infratech, and

representatives from other entities and subcontractors.

29.     At the September 29, 2009 Preconstruction Conference, the job schedule

was discussed.

30.     Spiniello and Infratech dispute whether or not the September 25, 2009 Bar

Chart Schedule (the "Schedule") (Trial Ex. 8), was distributed to Infratech's

representative, Greg Ranta, at the September 29, 2009 Preconstruction

Conference.  Naqeeb testified that he distributed the Schedule to the various

subcontractors at the meeting and that he specifically handed a copy of the

Schedule to Infratech's representative, Greg Ranta.  Ranta testified that he did

not receive the Schedule at the meeting, and he does not really remember

seeing Naqeeb at the meeting.  Ranta also does not remember a start date being

announced at the meeting.  Ranta testified that in about half of the

preconstruction meetings that he attends a schedule is not made up yet.  Ranta

also testified that if he had received a schedule, he would have given it to Quast.

Quast testified that the first time he saw the September 25, 2009 Schedule was

when his counsel showed it to him in the context of this litigation in April 2012.

Quast also testified that the fact that Ranta did not receive a schedule or a start

date at the meeting did not raise a red flag because Infratech seldom receives a

schedule in writing—although schedules are commonly discussed—and because

start dates are subject to change all the time and normally the general contractor

will call to tell him when they intend to start a project a couple of weeks in advance.

31.     There is no documentation to substantiate the transmittal of the Schedule to Infratech on or around September 29, 2009.

32.     Immediately after the September 29, 2009 Preconstruction Conference, Jack Bowling, a general superintendent with Spiniello at the time, spoke with Greg Ranta from Infratech.  Bowling inquired whether Infratech could clean 800 linear feet of pipeline per day.  Bowling also testified that he told Ranta that Infratech should use two vactor trucks in the beginning to stay ahead of Spiniello's crews.  Ranta told Bowling that he did not see why Infratech could not clean 800 feet per day if the pipeline is not that dirty.  And Ranta testified that he told Bowling that they could have two trucks on site if they were needed.

33.     After Ranta toured the jobsite on September 29, 2009, he was aware that the terrain would be rough, that if it rained the site conditions would become difficult, and that accessing the jobsite's water supply would be a challenge.

34.     On October 6, 2009, Ranta emailed Naqeeb in response to Naqeeb's request for a submittal on how the project would be done.  Ranta's October 6 email stated that Infratech would be cleaning "when [the] bypass is in place." (Trial Ex. 10.)

35.     There are no references to the September 25, 2009 Schedule in the emails that Naqeeb sent to Infratech throughout the duration of the project.

36.     Naqeeb testified that he did not give the Schedule to any Infratech

representative at the jobsite.

37.    Todd Sykora testified that he asked Jack Bowling for a schedule, but Bowling did not provide him with one.

38.    Sykora, Quast, and Ranta testified that ten business days to complete the cleaning of the pipe would have been unrealistic and unacceptable.  And Quast testified that he would not have signed the contract had Spiniello provided Infratech with a schedule that required such ten-day cleaning before the contract was signed.

39.    Sykora and Ranta testified that they, along with Quast, were involved in the bidding process and that they estimated thirty to forty days (i.e., six to eight weeks) for the total cleaning job.

**F.    THE KEY CONTRACT PROVISIONS**

40.    Spiniello and Infratech executed the Subcontract on October 7, 2009.

41.    Article I in the Subcontract states, in part, as follows:

> The Subcontractor, as an independent contractor, shall and will provide all labor, materials, scaffolds, tools, supplies, equipment, services, facilities, supervision, administration and all other things necessary for the proper and complete performance and acceptance of the Work hereinafter described, as shown on the plans and described in the specifications and in accordance with all the conditions of the General Contract.  The General Contract includes, but is not necessarily limited to, the agreement between the Owner and Contractor, plans, drawings, specifications, addenda, modifications, bulletins, work orders, proposal, special provisions and any and all other documents listed in or referred to by the General Contract.

(Trial Ex. 7 at Spiniello 000117.)

42.    "Bypass of Flow" is excluded from the work required of the Subcontractor according to the Subcontract.  (Trial Ex. 7 at Spiniello 000118.)

43.    Article II in the Subcontract states, in part, as follows:

The Subcontractor shall complete the several portions and the whole of the Work included in this Agreement in such order of precedence and within such times as may be necessary to maintain the timely progress of the Project as determined by the Contractor. Time is of the essence.

Should the progress of the Work or of the Project be delayed by any fault or neglect or act or failure to act of the Subcontractor or any of its officers, agents, servants or employees so as to cause the additional cost, expense, liability or damage to the Contractor or any damages or additional costs or expenses for which the Contractor may or shall become liable, the Subcontractor shall and does hereby agree to compensate Contractor for and indemnify it against all such costs, expenses, damages and liability.

. . . .

If, however, the progress of the Work or of the Project be delayed by any fault or neglect or act or failure to act of the Subcontractor or any of its officers, agents, servants or employees, then the Subcontractor shall, in addition to all of the other obligations imposed by this Agreement upon the Subcontractor in such case, and at its own cost and expense, work such overtime as may be necessary to make up for all time lost and to avoid delay in the completion of the Work and of the Project.

(Trial Ex. 7 at Spiniello 000118–19.)

44.    Article IV in the Subcontract states, in part, as follows:

The sum to be paid by Contractor to the Subcontractor for the satisfactory performance and completion of the Work, and of all of the duties, obligations and responsibilities of the Subcontractor under this Contract shall be: . . . $81,336.74.

(Trial Ex. 7 at Spiniello 000120.)

45.     Subdivision 4a in the General Contract states as follows:

**Prompt Payment to subcontractors.**  Each contract of a
municipality must require the prime contractor to pay any
subcontractor within ten days of the prime contractor's receipt of
payment from the municipality for undisputed services provided by
the subcontractor.  The contract must require the prime contractor to
pay interest of 1 ½ percent per month or any part of a month to the
subcontractor on any undisputed amount not paid on time to the
subcontractor . . . A subcontractor who prevails in a civil action to
collect interest penalties from a prime contractor must be awarded
its costs and disbursements, including attorney's fees, incurred in
bringing the action.

(Trial Ex. 2, General Contract at subd. 4a.)

46.     Article XI in the Subcontract states, in part, as follows:

Should the subcontractor at any time refuse or neglect to
supply a sufficiency of skilled workers or materials in the proper
quality and quantity, or fail in any respect to prosecute the Work with
promptness and diligence, or cause by any act or omission the
stoppage or delay of or interference with or damage to the work of
Contractor or of any other contractor or subcontractor on the Project,
or fail in the performance of any of the terms and provisions of this
Agreement, or should the Owner determine that the Work or any
portion thereof is not being performed in accordance with the
General Contract, then in any of such events, each of which shall
constitute a default hereunder on the Subcontractor's part,
Contractor shall have the right, in addition to any other rights and
remedies provided by this Agreement and the General Contract or
by law, after three (3) days written notice to the Subcontractor
mailed or delivered to the last known address of the latter, (a) to
perform and furnish through itself or through others any such labor
or materials for the Work and to deduct the cost thereof from any
monies due or to become due to the Subcontractor under this
Agreement and/or (b) to terminate the employment of the
Subcontractor for all or any portion of the Work, enter upon the
premises and take possession, for the purpose of completing the
Work of all materials, equipment, scaffold, tools, appliances and
other items thereon, all of which the Subcontractor hereby transfers,
assigns, and sets over to Contractor for such purpose, and to
employ any person or persons to complete the Work and provide all

the labor, services, materials, equipment and other items required therefor . . .

(Trial Ex. 7 at Spiniello 000124.)

47.     Article XXIII in the Subcontract states, in part, as follows:

        In case of any controversy between the Subcontractor and Contractor which does not involve the Owner, this Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey . . .

(Trial Ex. 7 at Spiniello 000131.)

## G.     THE WORK PERFORMED

48.     The Schedule called for Infratech to commence cleaning the sewer pipeline on October 26, 2009.

49.     Jack Bowling's handwritten Infratech report (Trial Ex. 11), stated that Infratech's first scheduled day was October 27, 2009, and that Infratech did not show up on that date.  It appears that this was a typographical error, and the date should have been listed as October 26, 2009.

50.     On October 27, 2009, around noon, Bowling called Richard Quast to inform him that the bypass was set up and to ask why Infratech was not at the jobsite.  Quast told Bowling that Infratech did not know that Spiniello was in town, but that he would see what he could do.  Quast testified that he did not have notice prior to this phone call as to when Infratech was supposed to start on the project.

51.     After that phone call, Quast directed Lonnie Jones from Infratech to take the only cleaning truck that Infratech had available up to the St. Cloud jobsite and

13

to start cleaning if possible.  Infratech owns a total of four cleaning trucks.

52.     Jones arrived on the jobsite on October 27, 2009.

53.     Jones testified that the bypass was not operational on October 27, 2009,

when he arrived on site.  Bowling states that to his knowledge, the bypass was

operational then.  Rodenberger testified that he received no reports about bypass

issues, but he was not there on site.  Naqeeb testified that he did not see any

problems with the setting up of the bypass during the previous week (week of

October 19th), when he was on site.  The Court finds Jones' testimony that the

bypass was not operational on October 27, 2009, believable.

54.     On October 27, 2009, Lonnie Jones attempted to move some debris down

to the first manhole, but the water flow was still "really heavy."  (Tr. 271.)  He

testified that Spiniello knew that the bypass was not operational yet, but that a

Spiniello representative told him to continue to clean anyway.

55.     Todd Sykora learned of the St. Cloud project for the first time from Jones

on October 27, 2009, and then on October 28 or 29, 2009, from Quast, and he

confirmed that when he visited the jobsite on October 28 or 29, 2009, the line

had water flow in it.

56.     Jack Bowling's handwritten report regarding Infratech (Trial Ex. 11),

indicated that Lonnie (Jones) from Infratech started cleaning at 9:00 am on

October 28 and 29, 2009, with one truck, and he shut down at 3:30 pm.

Infratech's time records show that Jones and Jason Peterson, another pipe

cleaner, worked an eight-and-a half hour shift on Wednesday, October 28, 2009,

14

and a seven-and-a-half hour shift on Thursday, October 29, 2009.  (Trial Ex. 25 at INFRATECH 00516–17.)

57.    Jack Bowling's handwritten report regarding Infratech (Trial Ex. 11), indicated that Lonnie (Jones) from Infratech started cleaning at 8:30 am on October 30, 2009, that he brought in a camera truck, and that he shut down at 4:00 pm.  Jones testified that he did not work on site on that Friday because it was a rain day and Spiniello had told him not to come in.  Infratech's time records show that Jones did not record any time on site for this day, but that he did spend three hours dumping for the St. Cloud job.  Infratech's time records also show that a televising crew was on site on October 29, 2009, but not on October 30, 2009.

58.    Jack Bowling's handwritten report regarding Infratech (Trial Ex. 11), indicated that no one from Infratech worked on the jobsite on Saturday or Sunday, October 31 and November 1, 2009.  This is consistent with Infratech's time records.

59.    Jones testified that work continued during the week of November 2, 2009, and that the bypass became operational later during the day on November 2, 2009.  However, the bypass had not been buried, which meant that Infratech could not move their cleaning truck to the next section of pipe that needed cleaning.  Also, even with the bypass operational, there was still water in the pipe that was not being extracted.

60.    During the night of November 2, 2009, Spiniello put some of its crew into

the pipe to finish cleaning the first segment of pipe so that Spiniello could be ready to line that segment on November 3, 2009.  Spiniello does not seek damages in this case for the cleaning that its crew completed during the night of November 2, 2009.

61.    Jones testified that later in the week of November 2, 2009, the bypass was buried.  At that point, Infratech provided a second cleaning truck at the jobsite.

62.    Lon MacRae, who was also on the jobsite the week of November 2, 2009, arriving on the Tuesday or Wednesday of that week with a second cleaning truck, testified that the bypass was running when he arrived, but that there was a lot of standing water in the pipe.  The Court finds MacRae's testimony believable.

63.    Todd Sykora confirmed that when he visited the jobsite on November 6, 2009, there was standing water in the pipe.  Sykora explained that the reason for the standing water at this point was because there was water flowing in the wrong direction coming from another 60-inch line midway down the pipe Infratech was cleaning.  Jones testified that once the bypass was operational and once Spiniello had diverted the water flowing from the other line, the cleaning became less of a challenge.

64.    On November 4, 2009, Naqeeb emailed Quast and Ranta out of concern for the project schedule and mentioned that when Bowling met Ranta at the Preconstruction Conference he "expressed the importance of cleaning approximately 800 lineal feet a day and to have two Vactor trucks to start so Infratech can keep up and stay ahead of us by at least one week."  (Trial Ex. 12.)

16

Naqeeb stated that "Ranta assured . . . Mr. Bowling that there will be two vactor trucks on site to start the project and Mr. Ranta did not say the 800 lineal feet of cleaning per day cannot be done." (*Id.*)  Naqeeb also urged Infratech "to come up with a plan showing how [it would] stay ahead of [Spiniello]" and asked what Infratech's contingency plan was.  (*Id.*)  Naqeeb stated, "Spiniello Companies has the right to seek financial damages from Infratech and to hire another cleaning contractor due to the lack of performance." (*Id.*)  Naqeeb did not mention the Bar Chart Schedule in this email, and he had not been at the jobsite from October 26, 2009, through November 4, 2009, when he sent this email. Quast did not respond to Naqeeb's email because he did not think the schedule was an issue since it took Spiniello ten days to get the water out of the pipe.

65.    Infratech crew did not work at the jobsite during the first two weekends, nor did Infratech crew work full days from 7 am to 10 pm on site during the weekdays, which was the time restriction the City ultimately placed on Infratech.

66.    Pursuant to the September 25, 2009 Schedule, Spiniello had not planned for Infratech to work weekends.

67.    Todd Sykora visited the jobsite on November 6, 2009, and spoke with Jack Bowling.  Sykora testified that he told Bowling that he was not aware of an October 26, 2009 start date, and that he asked Bowling for the schedule. Bowling did not give Sykora a schedule, then or at other times thereafter when Sykora asked for the schedule.

68.    Sometime in the morning on November 6, 2009, Sykora represented to

Bowling that based on what Sykora's crewmembers had reported to him, Infratech would be finished cleaning the second line by November 7, 2009. Sykora testified that he informed Bowling sometime later on November 6th that Infratech would not be finished cleaning the second line by the following day. Infratech did not complete cleaning the second line by November 7, 2009.

69.     Sykora testified that during the week of November 9, 2009, there were two bypasses in place, and there was still water flow in the pipeline.

70.     During the week of November 9, 2009, Spiniello's crews helped Infratech clean pipeline on two or three evenings.  Sykora testified that Bowling had discussed this with him, and told him that he had Spiniello employees who were not going to be doing anything anyway but were going to get paid regardless, so he would have them go into the pipe and shovel materials onto a pad and drag that to the manhole.  Some of the debris that Spiniello crews had collected fell off the pads when moving them toward the manhole; therefore, Infratech had to re-clean those areas.

71.     Spiniello was not able to perform their scheduled CIPP lining work during the week of November 9, 2009.  On November 9, 2009, Bowling asked Sykora whether he thought Infratech would be done cleaning the line it was working on, and that he needed to know by noon whether he should have the resin tankers sent to the jobsite.  Sykora told Bowling that he would check to see how far Infratech's crew had gotten.  After visibly seeing how much debris was still in the line, Sykora reported to Bowling at ten o'clock that the cleaning would not be

18

done and that he should not have the tankers come.  Spiniello cancelled the

tankers so that Spiniello would not incur a demurrage charge.

72.     Spiniello claims that it substantially cleaned about 900 feet of pipeline

during the week of November 9, 2009.  Infratech disputes this.  The Court finds

Infratech's witnesses credible based on the amount of debris that was sucked up

from Spiniello's piles and the amount of time that Infratech was able to continue

work before it needed to dump its cleaning truck.

73.     During the week of November 9, 2009, Infratech had three to four cleaning

trucks and fifteen to eighteen personnel at the jobsite, and three or four members

of Infratech's crew worked with one cleaning truck on Saturday and Sunday,

November 14 and 15, 2009.  Jones testified that he worked twelve to fourteen-

hour days during this week.  Quast testified that during a normal job where they

would have to transport water like they did for the St. Cloud project, he would

have had two cleaning trucks and six to eight personnel on site.  Quast testified

that Infratech had three to four cleaning trucks and fifteen to eighteen personnel

at the jobsite from the week of November 9th through the end of the project.

74.     It is undisputed that there was more debris in the pipeline than anyone

anticipated.  It is also undisputed that the consistency of the debris made it hard

to remove.

75.     On November 11, 2009, Naqeeb emailed Quast and Ranta about the

cleaning delays, and specifically stated, "We are incurring financial damages due

to the delay that is caused by your crew.  We need this line to be cleaned by

Friday 11/13/09.  We cannot afford more delays and we seek and reserve all the rights to take any actions if needed."  (Trial Ex. 14.)  Naqeeb urged Infratech to submit a work plan explaining how the remaining pipes would be cleaned in accordance with a schedule provided in the email.  That schedule called for: (1) the section starting with manhole 4714 to be ready for lining on November 20, 2009 (which was four days later than that called for in the September 25, 2009 Schedule); (2) the section starting with manhole 4712 to be ready for lining on November 27, 2009 (which was three days earlier than that called for in the September 25, 2009 Schedule); and (3) the section starting with manhole 4637 to be ready for lining on December 4, 2009 (which was three days earlier than that called for in the September 25, 2009 Schedule).  (*Compare* Trial Ex. 14 *with* Trial Ex. 8.)  Quast did not respond to Naqeeb's email because he believed Infratech had already implemented a contingency plan by bringing three to four cleaning trucks on site among other equipment, and because Infratech was incurring financial damages as well.

76.    Spiniello was able to resume lining on November 16, 2009.

77.    Todd Sykora and Lon MacRae relayed their concerns about the possibility that Spiniello would not pay Infratech to Jack Bowling during the week of November 9, 2009, and again during the week of November 16, 2009.  Jack Bowling responded stating that Infratech would get paid, and told them not to worry about it.  Richard Quast raised the same issue about not being paid to Naqeeb.  Quast remembers that Naqeeb assured him that Infratech would be

paid.

78.     On November 13, 2009, and again on November 20, 2009, Spiniello

issued revised schedules.  In the November 13, 2009 email from Naqeeb that

contained a revised schedule, Naqeeb stated, "We are trying to work with you

and do all our best to get this issue resolved and keep the schedule without any

delays.  We will re-schedule the lining shots to help you in cleaning and finish on

time."  (Trial Ex. 15.)  In the November 20, 2009 revised schedule, the last

section of pipeline was scheduled to be cleaned on December 7–13, 2009, with

lining to be installed on December 14–18, 2009.  (Trial Ex. 17.)

79.     During the week of November 23, 2009, Infratech had between eight and

twelve crew members working Monday, Tuesday, and Wednesday.  They did not

work on Thursday or Friday because of the Thanksgiving holiday.

80.     Spiniello originally planned to send its personnel home for the

Thanksgiving holiday.  However, the November 20, 2009 revised schedule

reflects that cleaning was to continue during the week of Thanksgiving and the

weeks after.  Because the bypass needed to be in operation to facilitate

Infratech's cleaning work, Spiniello was required to keep several of its crew

members on-site through Thanksgiving week, even though Infratech's crews took

Thanksgiving and the holiday weekend off.  This requirement was sanctioned by

Spiniello's revising of the schedule.  Sykora testified that even if Infratech were

done with its cleaning prior to Thanksgiving, Spiniello would have still had to

keep the bypass operational over the Thanksgiving holiday for purposes of its

lining because of the flow coming from the 60-inch pipeline.

81.     Infratech experienced several equipment issues that impeded its cleaning progress throughout the duration of the project.  On one occasion, Infratech's crew locked itself out of its cleaning truck.  On another occasion, Infratech's water supply line froze over because the line was not left running overnight.  And, Infratech's cleaning trucks and equipment also broke down or malfunctioned on occasion.  Quast testified that Infratech takes equipment breakdowns and unknown things into consideration when estimating the time and cost for projects.

82.     Infratech completed the cleaning of the sewer pipeline on December 9, 2009, which was earlier than the deadline provided in the November 20, 2009 revised schedule.

83.     Infratech removed 457 tons of debris from the pipe over the course of 32 days, utilizing 2,183 man hours to complete the job.  It paid approximately 600 hours of overtime to its personnel and more than $40,000 in extra fees for a company to dump the debris in a landfill.

84.     Infratech sent an invoice to Spiniello Companies for $81,336.74, dated December 17, 2009.

85.     The record does not reflect on what date Spiniello received payment from the City of St. Cloud.  However, it is undisputed that Spiniello did receive full payment from the City of St. Cloud.

86.     Spiniello did not pay $81,336.74 to Infratech within ten days of its receipt of payment from the City of St. Cloud.

87.   On January 5, 2010, Spiniello disputed the amount it owed to Infratech by notifying Infratech via email that it had incurred additional costs and financial damages due to Infratech's delay and that Spiniello would be submitting its backcharge figures to Infratech.  (Trial Ex. 18.)

88.   Spiniello disputed the amount it owed to Infratech in its Change Order No. 1 (Trial Ex. 53), dated March 17, 2010, which deducts $132,365.39 off the contract amount because of the pipeline cleaning delays that Spiniello attributed to Infratech during the weeks of November 9 and 22, 2009.  Thus, Spiniello indicated that Infratech owes Spiniello $51,028.65 in back charges.

89.   Rodenberger relied on Bowling's report to conclude that Spiniello had cleaned 900 feet of pipe.  Because 900 feet of pipe is 16% of the 6,000 feet of pipe covered by the Subcontract, Rodenberger deducted 16% from the $81,336.74 contract price.

90.   Sykora testified that Spiniello's crew cleaned some of the pipe, but did not completely clear it, and did not clean 900 feet of pipe.  McRae also testified that Spiniello's crew helped clean part of the pipe, but that the Infratech crew still had to remove the debris from the pipe that Spiniello's crew cleaned.

91.   The City of St. Cloud was satisfied with the cleaning and lining of the pipe.

Based on the above findings of fact, the Court hereby makes the following:

## CONCLUSIONS OF LAW

### A.   NEW JERSEY LAW

1.      According to its terms, and as the parties have agreed, the Subcontract is to be governed and construed in accordance with the laws of New Jersey.

2.      Under New Jersey law, "[a]s a general rule, the preponderance of the evidence standard applies in civil actions." *Liberty Mut. Ins. Co. v. Land*, 892 A.2d 1240, 1293 (N.J. 2006) (*citing State v. Seven Thousand Dollars*, 642 A.2d 967, 974 (N.J. 1994)). New Jersey courts apply this standard in breach-of-contract cases. *E.g.*, *McNeill v. Evergreen Court Condo. Ass'n., Inc*. A-0352-08T2, 2009 WL 2431566 (N.J. Super. Ct. App. Div. Aug. 11, 2009) (unpublished) (affirming lower court's application of the preponderance standard in a breach of contract case). "Under the preponderance standard, a litigant must establish that a desired inference is more probable than not." *Land*, 892 A.2d at 1243 (internal quotation omitted).

3.      Under New Jersey law, when the "terms of a contract are clear and unambiguous, there is no room for construction and the court must enforce those terms as written." *Watson v. City of E. Orange*, 815 A.2d 956, 959 (N.J. 2003).

4.      A "time is of the essence" clause is a "well-known and specialized term of art in contract law which makes manifest the parties' intent that tardy performance be treated as a material breach."  *Linan-Faye Constr. Co., Inc. v.*

*Hous. Auth.*, 995 F. Supp. 520, 523 (D.N.J. 1998).

5.      A breach of contract occurs when a party repudiates is contractual duties,

*Spring Creek Holding Co., Inc. v. Shinnihon U.S.A. Co., Ltd.*, 943 A.2d 881, 893-

94 (N.J. Super. Ct. App. Div. 2008); hinders performance by the other party to

the contract, *Coastal Oil Co. v. E. Tankers Seaways Corp.*, 103 A.2d 26, 32 (N.J.

Super. Ct. App. Div. 1954); or fails to perform its contractual obligations, *Murphy

v. Implicito*, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007).

## B.      SUBCONTRACT PROVISIONS AT ISSUE

6.      Infratech complied with Article I of the Subcontract, which stated that

Infratech shall:

> [P]rovide all labor, materials, tools, supplies, equipment, services,
> facilities, supervision, administration and all other things necessary
> for the proper and complete performance and acceptance of the
> [cleaning work], as shown on the plans and described in the
> specifications and in accordance with all the conditions of the
> General Contract.

(Trial Ex. 7 at Spiniello 000117.)[2]  Because the bypass was not operational

---

[2]      Spiniello also points to the following provision in Article I of the Subcontract
in its post-trial submissions for support of its breach of contract claim:  "The
Subcontractor shall keep on the Project site during the progress of the Work, a
competent superintendent who shall be the authorized representative of the
Subcontractor."  (Trial Ex. 7 at Spiniello 000118.)  This provision, however, was
not raised in Spiniello's Complaint as a basis for damages.  And Spiniello did not
seek to amend its Complaint to add this claim prior to trial, so no notice was
provided to Infratech that it was at issue.  Therefore, a claim for breach of this
provision is not before the Court.

      In addition, the Court inquired at trial as to the applicability of Article XI in
the Subcontract to Spiniello's claim.  Because this provision was also not raised

(Footnote Continued on Next Page)

during the first week of work when Lonnie Jones arrived on site, more crew,

cleaning trucks, supplies, or other equipment were not necessary for the

progress of the cleaning process, as any additional manpower or equipment

would have been fruitless.  Once Infratech was aware of the actual amount of

debris and the difficulties with removing it, and once the first bypass was buried

to allow another cleaning truck access to the pipeline, Infratech added an extra

cleaning truck and more crew members to the jobsite.  During the week of

November 9, 2009, Infratech had three to four cleaning trucks and fifteen to

eighteen personnel at the jobsite, some working twelve to fourteen-hour days,

and three or four of Infratech's crew worked with one cleaning truck on Saturday

---

(Footnote Continued from Previous Page)
in Spiniello's Complaint as a basis for damages, this provision is not properly
before the Court.  However, because the Court prompted the parties to address
this issue in their post-trial briefing, the Court notes that if the issue were before
the Court, it would conclude that Spiniello did not invoke its alternative remedies
available to it under Article XI of the contract.  Neither Naqeeb's November 5,
2009 email stating "Spiniello Companies urges Infratech to come up with a plan
showing how you will stay ahead of us and what is your contingency plan.
Spiniello Companies has the right to seek financial damages from Infratech and
to hire another cleaning contractor due to the lack of performance" (Trial Ex. 12),
nor Naqeeb's November 11, 2009 email stating "We are incurring financial
damages due to the delay that is caused by your crew . . . . We cannot afford
more delays and we seek and reserve all the rights to take any actions if needed
. . . . Spiniello Companies is urging Infratech to submit a work plan in how the
remainder of the 72" pipes will be cleaned and how it will commit to the above
schedule," were written notice that Spiniello was going to "perform and furnish
through itself or through others any such labor or materials for the Work and to
deduct the cost thereof from any monies due or to become due to the
Subcontractor," or that it was going to "terminate the employment of the
Subcontractor for all or any portion of the Work."  (Trial Ex. 7 at Spiniello
000124.)

and Sunday, November 14 and 15, 2009.  Infratech continued to staff the site this heavily through the completion of the cleaning project, with the exception of the Thanksgiving holiday.  Infratech provided sufficient labor, materials, tools, supplies, equipment, etc., to complete the cleaning of the sewer pipeline on December 9, 2009, which was earlier than the deadline provided in the November 20, 2009 revised schedule.

7.     Infratech complied with the "time is of the essence" provision in Article II of the Subcontract, which stated:

> The Subcontractor shall complete the several portions and the whole of the Work included in this Agreement in such order of precedence and within such times as may be necessary to maintain the timely progress of the Project as determined by the Contractor.  Time is of the essence.

(Trial Ex. 7 at Spiniello 000118.)  Infratech thus agreed to complete its work within the time that Spiniello determined was required to maintain timely progress.  And the General Contract required Spiniello to create a Bar Chart Schedule for the progress of the project.  The General Contract, however, allowed for the Schedule to be amended and "updated."  (Trial Ex. 5 at Spiniello 000458–49.)  Greg Ranta's statement to Jack Bowling after the Preconstruction Conference was not a promise to complete cleaning 800 feet of pipeline per day. However, even if Infratech knew of and agreed to the original Schedule dated September 25, 2009, which provided that the cleaning was to be completed within ten business days, Spiniello amended the schedule several times over the course of the project through email communication.  "Where time of performance

is of the essence of the contract, a party who does any act inconsistent with the supposition that he continues to hold the other party to his part of the agreement will be taken to have waived it altogether." *Salvatore v. Trace*, 109 N.J. Super. 83, 90–92, 262 A.2d 409 (App. Div. 1969) (quoting 6 Williston on Contracts § 856 (3d ed. 1962).   Further, "[w]hen a specific time is fixed for the performance of a contract and is of the essence of the contract and it is not performed by that time, but the parties proceed with the performance of it after that time, the right to suddenly insist upon a forfeiture for failure to perform within the specified time will be deemed to have been waived and the time for performance will be deemed to have been extended for a reasonable time."  *Id.* (quoting 6 Williston on Contracts § 856 (3d ed. 1962).  Here, by submitting revised schedules to Infratech, by reassuring Infratech that they would be paid, and by telling Infratech to continue to clean the pipeline, Spiniello waived any ten-day schedule.  The last schedule that Spiniello sent to Infratech is dated November 20, 2009, which provides the last day for cleaning was to be December 13, 2009, and that the bypass would continue to be operating through December 18, 2009.  (Trial Ex. 17.)  Infratech timely completed its cleaning within the deadline set in the November 20, 2009 revised schedule, and completed the cleaning in a satisfactory manner. Therefore it complied with the timeline "determined by the Contractor" as described in Article II of the Subcontract.

8.      Spiniello is not owed damages or backcharges under Article II of the Subcontract because the progress of the Work was not "delayed by any fault or

neglect or act or failure to act of [Infratech]."  (Trial Ex. 7 at Spiniello 000119.)
The record reflects that the progress of the Work was delayed by the fact that
Spiniello did not have the first bypass running until the week of November 2,
2009, that bypass was not buried until later in the week of November 2, 2009,
and water remained in the pipeline due to the multiple bypasses which made
extraction of the debris more difficult.   Maintaining and making the bypasses
operational was the responsibility of Spiniello.  Even if Infratech knew the start
date of the project was October 26, 2009, Spiniello was not ready for Infratech to
start cleaning at that point.  These initial delays were Spiniello's fault.  Therefore,
it was reasonable for Spiniello to assist with cleaning during the week of
November 9, 2009.  And the fact that Spiniello had to have some of its crew
members working during the week of Thanksgiving can be at least partly
attributed to these initial delays.  And, as explained above, Spiniello sanctioned
the revised schedule that allowed for cleaning to continue during and after the
week of Thanksgiving.

9.     Spiniello has not met its burden to establish that Infratech breached the
Subcontract.  Therefore, Spiniello is not entitled to damages or back charges
from Infratech arising out of the October 7, 2009 Subcontract.

10.     Under the terms of the Subcontract, Infratech is entitled to be paid for work
completed that was ultimately approved by the City.  Accordingly, Spiniello's
failure to make the full contract payment to Infratech is a breach of contract.

11.     Infratech has met its burden to establish that it is entitled to its full

Subcontract price.

## C.    INTEREST

12.    The General Contract between Spiniello and the City of St. Cloud requires Spiniello to pay its subcontractors in accordance with  Minn. Stat. § 471.425, Minnesota's Prompt Payment Statute.  Under that statute, Infratech would be entitled to 1.5% interest per month if the amount owed is undisputed and not paid within ten days of when Spiniello, the contractor, received payment from the City of St. Cloud, the municipality.  Minn. Stat. § 471.425, subd. 4a.

13.    Spiniello did not issue full payment to Infratech upon payment from the City.  Nevertheless, the Prompt Payment Statute has not been violated because Spiniello, in good faith, disputed the amount owed.  *See* Minn. Stat. § 471.425, subd. 4a ("Each contract of a municipality must require the prime contractor to pay any subcontractor within ten days of the prime contractor's receipt of payment from the municipality for the *undisputed* services provided by the subcontractor.  The contract must require the prime contractor to pay interest of 1-1/2 percent per month or any part of a month to the subcontractor on any *undisputed* amount not paid on time to the subcontractor.") (emphasis added). Therefore, Infratech is not entitled to compensation under Minn. Stat. § 471.425, and its claim under that statute will be dismissed.  Accordingly, Intratech is not entitled to interest on the $81,336.74 that is owed.

## ORDER FOR JUDGMENT

Based on the Court's Findings of Fact and Conclusions of Law, **IT IS**

**HEREBY ORDERED** that:

1.      On Spiniello's breach of contract claims against Infratech, judgment

be entered in favor of Infratech;

2.      On Infratech's breach of contract claims against Spiniello, judgment

be entered in favor of Infratech;

3.      On Infratech's Prompt Payment Act claim against Spiniello,

judgment be entered in favor of Spiniello;

4.      Infratech is entitled to damages from Spiniello in the total amount of

$81,336.74; and

5.      The Clerk of Court is directed to enter judgment in favor of Infratech

and against Spiniello in the total amount of $81,336.74.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Date: October 3, 2012                    _s/ Jeffrey J. Keyes_____
                                         JEFFREY J. KEYES
                                         United States Magistrate Judge